A09A1658. CABRERA v. THE STATE.
(694 SE2d 720)

SMITH, Presiding Judge.

Rodolfo Cabrera appeals from his conviction for trafficking in methamphetamine. He asserts that insufficient evidence supports his conviction and that he received ineffective assistance of counsel. Although sufficient evidence supports Cabrera's conviction, we must reverse and grant him a new trial because he received ineffective assistance of counsel.

Viewed in the light most favorable to the verdict, the record shows that a confidential informant arranged for a person named Arroyo to deliver two pounds of methamphetamine at a location in Hall County. Police officers set up surveillance at the delivery location and observed a sport utility vehicle park next to the confidential informant's vehicle. Cabrera was the driver, and Arroyo was seated in the front passenger seat. After the confidential informant identified Arroyo, the police detained both Arroyo and Cabrera. Two dogs trained to detect the odor of drugs separately showed "a strong odor response" to the center console between where Arroyo and Cabrera had been sitting, but the officers did not find any drugs in it. An officer "standing at the back area of the vehicle" saw "a crack on the left-hand side of the vehicle on the interior in the storage area on the plastic on the side of the vehicle." Another officer went "to the back area," and after the plastic in the

cargo area was pulled out, "reached in and recovered a bag which contained two Tupperware containers which contained . . . approximate[ly] two pounds of methamphetamine" worth $89,600. The registered owner of the sport utility vehicle lived at the same address as Cabrera. The police did not find any contraband on Cabrera's person.

After entering into a guilty plea agreement with Arroyo shortly before Cabrera's trial, the State called Arroyo as a witness. After Arroyo acknowledged that he had been charged with trafficking in methamphetamine, Arroyo answered the State's follow-up questions as follows:

Q. Mr. Arroyo, did you plead guilty to trafficking in methamphetamine on Friday here in this court?

A. Yes, sir.

Q. And you were represented by attorney Michael Friedman?

A. Yes, sir.

Q. And as part of that being in court you were under oath and were asked questions and answered them, is that correct?

A. Yes.

Q. I'm going to ask you some of those same questions. Mr. Arroyo, on or about June the 22nd of 2005, did you have a conversation with someone here in Hall County and agree to secure methamphetamine for them?

A. I can't answer any questions.

Q. You answered that yes on Friday, didn't you?

A. I'm not going to answer any questions.

Q. Mr. Arroyo, did I ask you — strike that. Did you contact someone to get that methamphetamine from the person?

A. I'm not going to answer any questions.

Q. Mr. Arroyo, didn't you answer that under oath yes on Friday?

A. I'm not going to answer questions.

Q. Who was that person, Mr. Arroyo?

A. I'm not going to answer.

Q. Didn't you answer that it was Rudolf Cabrera?

A. I'm not going to answer.

Q. Mr. Arroyo, have you been threatened since you were in court on Friday?

A. I will not answer any questions.

Q. You have been in contact with Mr. Cabrera in the Hall County jail, haven't you?

A. I will not answer any questions.

Q. And he found out you were going to testify Friday, didn't he?

At this point, Cabrera's counsel objected on the ground that it was a leading question. The trial court overruled it after clarifying that the "objection voiced . . . was to . . . leading questions." The State then resumed its questioning of Arroyo as follows:

Q. And, Mr. Arroyo, did you, in fact, travel to meet with Mr. Carbrera about obtaining methamphetamine?

A. I will not answer any questions.

Q. Isn't it true, Mr. Arroyo, that you testified, yes, that you met with Mr. Cabrera about obtaining methamphetamine?

A. I will not answer any questions.

Q. Mr. Arroyo, what amount of methamphetamine were you obtaining from Mr. Cabrera?

A. I will not answer any questions.

Q. Mr. Arroyo, isn't it true under oath on Friday you answered that two pounds of methamphetamine?

A. I will not answer any questions.

Q. Mr. Arroyo, how much were you going to sell the two pounds of methamphetamine for?

A. I will not answer any questions.

Q. Mr. Arroyo, isn't it true that you answered that under oath on Friday as being $20,000?

A. I will not answer any questions.

Q. Mr. Arroyo, where did you meet Mr. Cabrera at to obtain the two pounds of methamphetamine?

A. I will not answer any questions.

Q. Mr. Arroyo, isn't it true that you answered that under oath on Friday that you met him at a gas station?

A. I will not answer any questions.

Q. Mr. Arroyo, did he — did he, being Mr. Cabrera, agree to come back and deliver the two pounds of methamphetamine with you?

A. I will not answer.

Q. Mr. Arroyo, isn't is true that you answered that yes under oath on Friday?

A. I will not answer.

Q. Mr. Arroyo, who was driving the vehicle when y'all attempted to deliver the two pounds of methamphetamine?

A. I will not answer any questions.

Q. Mr. Arroyo, isn't it true that you answered that under oath on Friday?

A. I will not answer any questions.

Q. Mr. Arroyo, whose car or vehicle were you traveling in to deliver the methamphetamine?

A. I will not answer any questions.

Q. Isn't it true, Mr. Arroyo, that you answered that under oath on Friday?

A. I will not answer any questions.

Q. Mr. Arroyo, when you arrived at the location for the delivery with Mr. Cabrera, were you both arrested?

A. I will not answer any questions.

Q. Isn't it true that you answered under oath on Friday that, yes, you and Mr. Cabrera were arrested?

A. I will not answer any questions.

Q. Mr. Arroyo, how long have you known Mr. Cabrera?

A. I will not answer any questions.

Q. Isn't it true that you stated under oath here Friday that you had known him two years?

A. I will not answer any questions.

Q. Mr. Arroyo, has he provided methamphetamine for you on previous occasions?    . . .

A. I will not answer any questions.

Q. Didn't you say he had provided methamphetamine for you on previous occasions under oath on Friday?

A. I will not answer any questions.

Q. Mr. Arroyo, how much was Rudolf Cabrera charging you per pound for methamphetamine?

A. I will not answer any questions.

Q. Isn't it true that you answered under oath on Friday that you were paying $19,000 for the two pounds of methamphetamine?

A. I will not answer any questions.

Q. Mr. Arroyo, how much money did you — were you to make off the methamphetamine sale?

A. I will not answer any questions.

Q. Mr. Arroyo, isn't it true that you stated you were to make $1,000 in profit on Friday under oath?

A. I will not answer any questions.

Q. Mr. Arroyo, do you agree those are the questions I asked you Friday under oath before Judge Fuller —

A. I will not answer any questions.

Q. — when you were represented by Michael Friedman, your attorney, who was present?

A. I will not answer any questions.

Q. Mr. Arroyo, weren't you sentenced under your trafficking plea to 25 years to serve 15 in the penitentiary?

A. I will not answer any questions.

Q. And to pay a fine of $400,000 plus all the surcharges?

A. I will not answer any questions.

Q. Mr. Arroyo, do you remember the court reporter, Mr. Bill Abel, taking down your testimony under oath on Friday?

A. I will not answer any questions.

Q. Mr. Arroyo, what has happened between Friday and today to cause you to refuse to testify here today?

A. I will not answer any questions.

Q. Mr. Arroyo, were you present at the time of your plea when your attorney and I and the judge discussed segregating you from Mr. Cabrera in the jail.

A. I will not answer any questions.

Q. And isn't it true that you've been in the same cell block as Mr. Cabrera since Friday until yesterday when you came to court?

A. I will not answer any questions.

At the conclusion of its direct examination, the State introduced into evidence, without objection from defense counsel, a transcript from Arroyo's guilty plea hearing. Later in the trial, defense counsel made a continuing witness objection to the plea colloquy being considered by the jury during their deliberations, and the trial court sustained the objection. A review of the transcript does not reveal that the plea colloquy was ever published or read to the jury.

At defense counsel's request, the trial court charged the jury that "[e]vidence does not include ... the content of any questions asked by the attorneys." The trial court also reminded the jury before the closing arguments of counsel "that nothing that the attorneys have said or might have implied through their questions is evidence for your consideration. . . ."

1. Cabrera contends that insufficient evidence supports his conviction because he was merely present near hidden contraband. We have excluded from our review of this issue the State's leading questions to Arroyo and the plea colloquy. "[H]earsay testimony is not only inadmissible but wholly without probative value, and its introduction without objection does not give it any weight or force whatever in establishing a fact." (Citations and punctuation omitted.) *In re Burton*, 271 Ga. 491, 494 (3) (521 SE2d 568) (1999). See also *Barksdale v. State*, 265 Ga. 9, 10-11 (2) (a) (453 SE2d 2) (1995) (co-defendant's statement inadmissible hearsay because he refused to answer any questions in court); *Lingerfelt v. State*, 235 Ga. 139, 140 (218 SE2d 752) (1975) (State cannot introduce co-indictee's statement through leading questions when co-indictee refuses to testify).

The remaining evidence against Cabrera establishes that he did not own the SUV he was driving at the time of his arrest, that the owner lived at the same address as Cabrera, that the methamphetamine was hidden in the rear compartment of the car, that his passenger arranged for the sale of the same quantity of methamphetamine found in the SUV, that the informant talked to Arroyo several times to provide directions while Arroyo was on his way with the methamphetamine, and that Cabrera drove to the location arranged by the informant and Arroyo for pick-up of the methamphetamine.

Where the State is unable to provide evidence of actual possession, it may sustain a conviction based upon evidence of constructive possession. *Johnson v. State*, 282 Ga. App. 52, 54 (1) (637 SE2d 775) (2006). Constructive possession requires proof that the accused "knowingly had both the power and the intention at a given time to exercise control over the drugs." (Citation, punctuation and footnote omitted.) Id. In cases involving contraband found in automobiles, the State is generally entitled to an evidentiary presumption that the owner or driver of the automobile is in constructive possession of the contraband. See *Ramirez v. State*, 290 Ga. App. 3, 4 (1) (658 SE2d 790) (2008). That presumption does not apply, however, where there is evidence that persons other than the accused had equal access to the vehicle prior to the discovery of the drugs. *Farmer v. State*, 152 Ga. App. 792, 796 (264 SE2d 235) (1979). But "the equal access rule does not apply to eliminate the presumption of possession where all persons allegedly having equal access to the contraband are alleged to have been in joint constructive possession of the contraband." (Citation and punctuation omitted.) *Ramirez*, supra, 290 Ga. App. at 4 (1).

In this case, Cabrera was not entitled to the benefit of the equal access rule because the State also indicted Arroyo for possessing the

methamphetamine. Id. at 4-5 (1). Based upon the rebuttable presumption that Cabrera constructively possessed the methamphetamine found in the car in which he was driving and all of the other non-hearsay evidence submitted by the State, we conclude that sufficient evidence supports his conviction. Id.

2. In his remaining enumeration of error, Cabrera asserts he received ineffective assistance of counsel because his lawyer failed to raise a Confrontation Clause objection when the State began asking leading questions after Arroyo refused to testify. Cabrera contends his counsel should also have objected to the introduction of Cabrera's plea colloquy into evidence.

> The two-prong test for determining the validity of a claim of ineffectiveness of counsel provided in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984) asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different, but for counsel's deficiency.

(Citation, punctuation and footnote omitted.) *Bruce v. State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001).

We recognize that trial counsel agreed in the motion for new trial hearing that "these issues of objection were strategic in nature" based upon her defense theory that Cabrera was simply an innocent driver who gave a ride to the wrong person. She also testified, however, that she did not have a problem with the jury hearing the contents of Arroyo's plea colloquy through the State's leading questions because she had expected Arroyo to testify about his involvement with the drugs. Finally, she acknowledged that if she had been "aware of common law that said a plea was inadmissible in the face of a co-defendant's refusal to testify, were I aware of a piece of law that said that, I would have kept it out."

Based on the well-established law that the State cannot introduce a co-indictee's statement through leading questions when the co-indictee refuses to testify, we must conclude that trial counsel provided ineffective assistance by failing to object. *Lingerfelt v. State*, 235 Ga. 139, 140 (218 SE2d 752) (1975). To the extent she may have failed to object based upon trial strategy, we find that it was "not a *reasonable* decision a competent attorney would have made under the same circumstances." *Benham v. State*, 277 Ga. 516, 518 (591 SE2d 824) (2004). "[I]nvoking the words 'tactics' and 'strategy' does not automatically immunize trial counsel against" an ineffective assistance of counsel claim. (Citation and punctuation omitted.) Id.

We also find that Cabrera has demonstrated a reasonable probability that the outcome would have been different if his trial counsel had made the proper objection to the prosecutor's questioning of Arroyo. The questioning refuted the defense theory that Cabrera was an innocent driver who was not involved in the drug transaction. It also implied that Cabrera had threatened Arroyo into refusing to testify against him.

> In *Bruton*, the U. S. Supreme Court ruled that the admission of the confession of a non-testifying co-defendant inculpating the defendant deprived the defendant of the right to cross-examine witnesses, included in the Sixth Amendment right to confront witnesses, even when the admission of the co-defendant's statement was accompanied by an instruction limiting the jury's consideration of the confession to the case against the confessing co-defendant. The court based its holding on the recognition that deliberately spreading before the jury the "powerfully incriminating extrajudicial statements of a co-defendant" untested by cross-examination was a threat to a fair trial as it presented a situation "in which the risk that the jury will not, or cannot, follow instructions [to consider the confession only against its maker] is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

(Citation and footnote omitted.) *Hanifa v. State*, 269 Ga. 797, 801 (2) (505 SE2d 731) (1998).

In this case, the numerous questions posed by the State were so powerfully incriminating that we cannot presume that the jury followed the trial court's instruction against treating the questions posed by the lawyers as evidence. Compare *Wilcox v. State*, 297 Ga. App. 201, 205 (2) (677 SE2d 142) (2009) (based upon trial court's limiting instruction, defendant could not demonstrate prejudice from trial counsel's failure to object to prosecutor's reference to the co-defendant's guilty plea during opening statement). Our opinion in *Wilcox* does not require a different result because in *Wilcox*, the evidence brought before the jury was the mere fact that the co-defendant had pled guilty. In this case, Arroyo was called to the witness stand and asked numerous questions inculpating Cabrera in the crime, all of which Arroyo refused to answer. Based upon the particular facts and circumstances of this case, trial counsel provided ineffective assistance of counsel by failing to object to this violation of her client's right to effective cross-examination under the Con-

frontation Clause of the Sixth Amendment, and Cabrera is therefore entitled to a new trial.

*Judgment reversed. Phipps and Bernes, JJ., concur.*

DECIDED APRIL 12, 2010.

*Nicki N. Vaughan, Adam S. Levin, Richard J. Silver*, for appellant.

*Lee Darragh, District Attorney, John G. Wilbanks, Jr., Assistant District Attorney*, for appellee.